NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0415n.06

Case No. 20-5731

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JACOB PIERCE, | ) | |
| | ) | **FILED** Sep 02, 2021 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| BUCKY ROWLAND, et al., | ) | TENNESSEE |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: GIBBONS, WHITE, and THAPAR, Circuit Judges.

PER CURIAM. Sometimes litigation is more about strategy than it is about law. Four defendants had a viable procedural defense and pursued it. The fifth decided to put the plaintiff to his proof. We'll honor that choice: Her case will proceed.

I.

Jacob Pierce was an inmate in the Maury County Jail in Tennessee. As he tells things, he saw correctional officer Beth Posey selling contraband to another inmate. Pierce questioned the inmate and told jail officials what he learned: Posey was selling cigarettes, lighters, and possibly more. When officials searched the inmate's cell, they discovered loose tobacco and cigarette filters.

About two weeks later, Posey stopped by Pierce's cell. According to Pierce, Posey said she knew that Pierce had reported her, but told him that she had things "taken care of." She warned:

"If I get in any kind of trouble, I will have you f---ed up." After that encounter, Pierce says the other inmates began calling him a snitch. And the next day, some of those inmates attacked him.

Posey tells a different story. She was not on duty the day of the attack. And she denies having anything to do with it.

After the attack, the jail authorities took Pierce to a nearby hospital to receive treatment for his injuries. When he returned from the hospital, jail staff housed him in the booking area out of concern for his safety. Ultimately, Pierce was transferred to another jail.

Pierce sued Posey for orchestrating the attack and two other correctional officers (Jacob Wilson and Jacob Marbet) for failing to render timely aid when Pierce called for help. He alleged violations of his Eighth and Fourteenth Amendment rights. He also sued Maury County and County Sheriff Bucky Rowland for failing to properly hire, train, supervise, and discipline jail staff. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Aside from these federal claims, Pierce also alleged various state law torts, including assault and battery, conspiracy, negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. The district court granted the defendants' motions for summary judgment. Pierce appeals.

## II.

The defendants took different approaches in response to Pierce's claims. Everyone but Posey claimed that Pierce failed to exhaust his administrative remedies. They are correct.

## A.

The Prison Litigation Reform Act (PLRA) requires inmates to exhaust administrative remedies before bringing a lawsuit to challenge the conduct of jail officials. 42 U.S.C. § 1997e(a). To satisfy the PLRA's exhaustion requirement, inmates must attempt to resolve their complaints

through the jail's internal grievance policy. *Jones v. Bock*, 549 U.S. 199, 218 (2007). That means complying with the grievance policy's filing deadlines and other procedural rules. *Woodford v. Ngo*, 548 U.S. 81, 88–91, 94 (2006).

But failure to exhaust does not automatically end the case. The PLRA's exhaustion requirement is an affirmative defense. *Jones*, 549 U.S. at 216. So to benefit from the rule, defendants must generally plead and prove non-exhaustion. *But see id.* at 214–15 (suggesting that courts may dismiss an inmate's case sua sponte if a failure to exhaust is apparent from the face of the complaint). If a defendant does not raise non-exhaustion in the pleadings or cannot carry the burden of proof at later stages of the case, a court will consider the inmate's claim on the merits.

B.

Of the five defendants, all but Posey argue that Pierce failed to exhaust administrative remedies. To prove it, these defendants offer records of Pierce's kiosk history. Pierce used the kiosks for various purposes in the days after the attack, but none of the entries complain about the jail's response to his calls for help. From these records, the district court found that Pierce failed to exhaust available administrative remedies. So it granted summary judgment to these defendants. We agree.

Pierce gives two reasons why the PLRA is no defense to his suit against Wilson, Marbet, Rowland, and the County. First, he argues that he properly exhausted his administrative remedies because he submitted six grievances through the kiosk system and wrote a note to Wagonshultz, the jail administrator. Alternatively, Pierce argues that he was not required to exhaust his administrative remedies because the grievance process was unavailable to him because he feared for his safety. However, the record does not support either argument.

Pierce contends that he properly exhausted by filing six grievances through the kiosk system and a handwritten note. To properly exhaust his remedies, the prisoner must "complete the administrative review process in accordance with the applicable procedural rules," which "are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218 (quoting *Woodford*, 548 U.S. at 88). In other words, "[c]ompliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust.'" *Id.* Maury County gives inmates a handbook that briefly describes the grievance process, stating that an inmate may file a grievance within seven days of the "grieved incident" through the jail's kiosk system. R. 33-5, Pg. ID 211–12. The handbook does not define what constitutes a grievance and does not provide any information as to what an inmate must include in his complaint.

Although Pierce submitted six messages through the kiosk system, he does not dispute that all but two of them were untimely because he submitted them more than seven days after he was assaulted. Because the jail's policy states that grievances must be filed within seven days of the grieved incident, we may not consider the untimely messages. Nor may we consider the handwritten note, which Pierce submitted fifteen days after the attack. Thus, we may consider only the first two kiosk messages. In Pierce's first message, he asked to speak with Officer Jimmy Byrd "asap" about his "situation with all that has went on." R. 54-1, Pg. ID 417. Pierce claims that he encountered Byrd while in nursing after the assault and told Byrd that he had been attacked by inmates at Posey's instruction. Pierce's second kiosk message stated that he had "needed medical attention" after three inmates had entered his room. *Id.* Pierce also said that some personal items were missing from his cell when he returned from the hospital, and he asked for assistance in recovering them.

A prisoner must properly exhaust his remedies as to each federal claim on which he later seeks relief. *Jones*, 549 U.S. at 220–24. Pierce alleged numerous federal claims against Wilson, Marbet, and Rowland in his complaint: excessive force, cruel and unusual punishment, denial of medical attention, and freedom from arbitrary governmental activity that shocks the conscience (related to the denial of medical care).[1] Pierce also claimed that Rowland and the County failed to adequately hire, train, and supervise employees. Factually, claims against Wilson and Marbet, who were staffing the control tower, arise from their delay in summoning help for Pierce when he was attacked. Those against Rowland do not link him factually to the attack. At most, Pierce's two messages complain about the assault and—if we consider Byrd's knowledge—Posey's role in the attack. The messages cannot be construed as grieving the claims against Wilson and Marbet or against Rowland and the County based on the actions of Wilson and Marbet. Pierce's argument that he properly grieved the claims against Wilson, Marbet, Rowland, and the County fails.

Pierce argues in the alternative that he was not required to exhaust his administrative remedies because the grievance process was unavailable to him since he feared for his safety by reporting what happened. Inmates "need exhaust only such administrative remedies as are 'available.'" *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016) (citing 42 U.S.C. § 1997e(a)). Administrative remedies might be "unavailable" when "officials [have] misled or threatened individual inmates so as to prevent their use of otherwise proper procedures." *Id*. at 1860. The record demonstrates that Pierce was afraid that Posey might find out that Pierce had another complaint about her conduct.[2] But missing from the record is any statement that Pierce did not

---

[1] Pierce's complaint does not specify which defendants are responsible for each alleged violation.

[2] Had Posey raised the issue, a jury perhaps could have concluded that, as to the claims against her, she "inhibit[ed] [Pierce] from utilizing an administrative process through threats or intimidation," such that the "process can no longer be said to be 'available,'" considering that Pierce had allegedly just been threatened, beaten, and labeled

pursue grievances against the other defendants—Wilson, Marbet, Rowland, and the County— because he feared reprisals from them. Pierce does not even argue that he failed to properly grieve his claims as to those defendants because he feared that his protests would reach Posey and potentially cause her to retaliate.

Pierce never complained about the other defendants until he sued them—even though he had sent in the handwritten note about his desire to press charges. In that note, he only alleges threats from Posey. He makes no mention of the other defendants. If, as he claims, Posey threatened Pierce, he would have been the most reluctant to name Posey in a complaint. But since he felt safe enough to name Posey in the note, surely he would have felt safe enough to name the other defendants too, if he had any reason to fear them.

What's more, the story Pierce tells—that Posey threatened to "f--- him up" if *she* got in any kind of trouble—would not implicate the other prison officials. If Pierce filed a grievance about the guards' failure to respond to his calls for help, without contending that Posey orchestrated the attack, there is no reason to believe it would get back to Posey. So her threats did not make exhaustion unavailable as to the other defendants, as the dissent claims.[3]

\* \* \*

Pierce failed to produce evidence that would support his unavailability argument. Without any record evidence that the grievance process was unavailable as to the claims against Wilson, Marbet, Rowland, and the County, summary judgment as to those defendants was proper.

---

a "snitch" for making a confidential complaint about Posey that had leaked back to her. *Ross*, 136 S. Ct. at 1860 n.3 (quoting *Tuckel v. Grover*, 660 F.3d 1249, 1252–53 (10th Cir. 2011)).

[3] These facts together show why we are not in tension with the cases to which the partial dissent points. *See Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576, 577–78 (6th Cir. 2014) (applying the unavailability exception across defendants); *Does 8–10 v. Snyder*, 945 F.3d 951, 966–67 (6th Cir. 2019) (same).

III.

Unlike her co-defendants, Posey did not raise Pierce's failure to exhaust as an affirmative defense. Instead, she chose to litigate the case on the merits. She claimed that Pierce failed to offer evidence of her involvement in the attack. The district court agreed and found that the evidence Pierce submitted was "scant" and based on "speculation" and "conjecture." R. 79, Pg. ID 569. So it granted Posey's motion for summary judgment.

Thus, the critical question is whether Pierce submitted enough evidence to show that Posey was involved in the attack. In assessing this question, we view the facts (including all reasonable inferences from the facts) in the light most favorable to Pierce.

The lion's share of Pierce's evidence comes from his own statements during an interview with investigators after the attack. Pierce swears to the truth of these statements in a signed affidavit. Of course, a party may rely on an affidavit to establish a fact, so long as the affidavit (1) is based on personal knowledge and (2) points to evidence that ultimately can be admitted at trial. Fed. R. Civ. P. 56(c)(4).

In the interview, Pierce told jail officials Posey was selling contraband and threatened to have him beat up if she got in trouble. He reported that other inmates began calling him a snitch after his conversation with Posey, even though he only told jail officials about the contraband sales. Pierce swore this interview was accurate in his affidavit. And Pierce's statements are based on personal knowledge and would be admissible at trial if repeated from the witness stand.

Pierce's story is not without some corroboration. An incident report shows that when jail officials searched a cell based on Pierce's tip, they found tobacco and cigarette filters. And no one disputes that Pierce was attacked. Of course, a smoking gun showing Posey's involvement would be better. But you don't need a smoking gun to get to a jury.

When viewing the evidence in the light most favorable to Pierce—as we must—is it all that unreasonable for a jury to conclude that Posey had a hand in Pierce's attack? After all, the attackers called him a snitch. And that was after Posey allegedly threatened to "have [Pierce] f---ed up." From these facts, a reasonable jury could conclude that she made good on the threat.

As for Posey, the only evidence to support her side of the story is her own statements denying that she orchestrated the attack. But notably, Posey does not deny that she spoke with Pierce the day before. Nor does she deny that she threatened him. At bottom then, this case is a he-said-she-said dispute. And when cases amount to a truth-telling contest, juries—not judges—decide the winner.

So where did the district court go wrong? It dismissed Pierce's evidence as "speculation and conjecture." R. 79, Pg. ID 569. Pierce's statements are anything but. In a lengthy interview with investigators, Pierce laid out a coherent and detailed account of the events leading up to the attack and answered every one of the investigators' questions along the way. Perhaps the district court discounted Pierce's affidavit because it is (largely) uncorroborated. *See id.*, Pg. ID 569 n.4 ("Plaintiff has presented *only his own conjecture* that Officer Posey was responsible for the attack against him." (emphasis added)). But the rules for summary judgment do not require a plaintiff's affidavit to be corroborated. *See Moran v. Al Basit LLC*, 788 F.3d 201, 206 (6th Cir. 2015) ("Despite the lack of corroborating evidence, Plaintiff's testimony is sufficient to create a genuine dispute of material fact that forecloses summary judgment at this juncture."). So that is not a reason to keep the case from a jury.

To be sure, there are circumstances in which a plaintiff's affidavit, standing alone, is not enough to stave off summary judgment. For example, a plaintiff cannot create a fact dispute by submitting an affidavit chock full of conclusory allegations. *See Revis v. Meldrum*, 489 F.3d 273,

287–88 (6th Cir. 2007). A court also may consider an affidavit incredible if it is riddled with internal contradictions. *See, e.g.*, *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 324 (6th Cir. 1998). And under the "sham affidavit" doctrine, a court may strike an affidavit that contradicts the affiant's prior sworn testimony. *See France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016). Finally, even if a plaintiff's affidavit is valid, it cannot preclude summary judgment if it stands as a mere "scintilla" of evidence against a mountain of proof offered by the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). But none of those circumstances are present here.

The evidence here consists of one party's affidavit against another's. And no rule of procedure allows us to disregard Pierce's side of things just because he is the plaintiff. *See Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) ("A court may not disregard evidence merely because it serves the interests of the party introducing it."). If this case reaches trial, the jury must decide which side is telling the truth.

\*     \*     \*

The competing affidavits here show that there is a dispute of material fact that a jury must resolve. So we vacate the district court's order granting summary judgment in Posey's favor.

## IV.

Pierce's claims that the County failed to adequately hire, train, and supervise employees are, perhaps, related to the claims against Posey. Assuming that Pierce either properly grieved those claims or that the grievance process was unavailable, the PLRA would not bar liability. However, summary judgment on the claims against the County stemming from Posey's conduct was proper because Pierce failed to state a valid basis for relief. *See Brown v. Tidwell*, 169 F.3d

330, 332 (6th Cir. 1999) ("This court can affirm a decision of the district court on any grounds supported by the record, even if different from those relied on by the district court.").

"A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691). "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" *Griffith v. Franklin County*, 975 F.3d 554, 581 (6th Cir. 2020) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)). The "plaintiff does this by showing that the municipality had a 'policy or custom' that caused the violation of her rights." *Id*. (quoting *Monell*, 436 U.S. at 694). The plaintiff may prove a municipality's illegal policy or custom by demonstrating: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Id*. (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

Here, the record is devoid of evidence that would support municipal liability on any of those four theories. There is no evidence that the county or Sheriff Rowland were aware of or acquiesced in Posey's conduct, even if her actions amounted to a constitutional violation.[4] Nor does Pierce identify any particular custom or policy that caused his injury. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993). These deficiencies are fatal to Pierce's claims.

---

[4] "The County cannot be liable unless [the plaintiff] establishes an underlying constitutional violation." *Griffith*, 975 F.3d at 581.

V.

On remand, the district court must consider whether to exercise supplemental jurisdiction over Pierce's state-law claims against all defendants. *See* 28 U.S.C. § 1367(a), (c). Since the PLRA's exhaustion requirement applies to actions brought under federal law, Pierce's state law claims, including those against Wilson, Marbet, Sheriff Rowland, and Maury County, remain viable. *See* 42 U.S.C. § 1997e(a).

\* \* \*

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

WHITE, Circuit Judge, concurring in part and dissenting in part. I agree that Pierce has shown a sufficient dispute of material fact to survive summary judgment on his claims against Posey. But I would also reverse the district court's determination that the PLRA barred Pierce's claims against the other defendants, Wilson, Marbet, Rowland, and the County (the "Non-Posey Defendants"). A jury could find that the grievance process was "unavailable" as to these defendants.

## I.

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has recognized an exception to the exhaustion requirement when a prison's grievance procedures are "unavailable," as when prison officials "threaten[] individual inmates so as to prevent their use of otherwise proper procedures." *Ross v. Blake*, 136 S. Ct. 1850, 1860 (2016). A jury could find that this exception applies here. Context is key to understanding why.

### A.     Relevant Factual Context

Pierce alleges that Beth Posey caused inmates to beat him up in his cell because Pierce told other correctional officers that Posey was selling contraband to inmates. Pierce was housed in the Maury County Jail (Jail), which was run by the Maury County Sheriff's Office. The Jail provides kiosks for inmates to use to file grievances and requires grievances to be filed within seven days of the incident being grieved.

Four days after Pierce was attacked, he wrote a message on a kiosk to an Officer Byrd. On its face, the message was quite vague. *See* R. 54-1 PID 417 ("hey byrd i would like to speak with

you please, asap if possible its concerning my situation with all that has went on thank you so much"). Seven days after the attack, Pierce wrote another message, which mentioned the attack but seemed to focus on getting missing items returned. On their face, neither suggested that Pierce wanted to file a grievance related to the attack. But he had good reason to remain vague.

About two weeks prior to October 16, Pierce told two corrections officers, David Stewart and CO Osborne, that he had seen Posey selling contraband to inmates. On October 16, Posey took three of Pierce's immediately neighboring inmates out of their cell and spoke to them in a suspicious way. She then took Pierce out of his cell, said she heard Pierce was trying to get her in trouble, and told him that his "ass is grass" and that if she got in any trouble, she would have him "f---ked up." R. 47 at 3:00-3:44. Right after that, the neighboring inmates she had just spoken with began calling Pierce a "snitch" and threatening violence. Word began to spread around the jail and soon other inmates started doing the same, causing Pierce to have a panic attack. The next day, Pierce was beaten in his cell by the three neighboring inmates that Posey had spoken to the day before.

The day after that, Pierce gave a recorded thirty-minute interview with two investigators, also members of the Sheriff's Department. That conversation sheds light on the one-line message to Officer Byrd that Pierce would file three days later. In the interview, Pierce explains that he was afraid to tell lieutenants or any officers—other than Byrd and another officer named "Gerald," whom he trusted—who attacked him.

According to other parts of his interview, he had good reason to be concerned. Pierce explained that he had told nobody about Posey's contraband activities other than two corrections officers (Stewart and Osborne) who worked a separate shift from Posey, with the clear implication that he was afraid of being labeled a snitch. *See id.* at 22:14-22:57 ("[T]hat's just not something

that you really, you know, want to tell anybody. You can't trust nobody back here like that."). Yet the message leaked out and got back to Posey. *Id.* at 14:38-14:56 ("Like I said, I talked to David [Stewart] and then it leaked out from his shift . . . to another shift, which Beth Posey's on, personally to her, and let her know 'hey this guy is trying to set you up.'"). The Sheriff's Department interviewers told Pierce that he seemed right to be worried about raising complaints to corrections officers. After Pierce said he only told two corrections officers—but no inmates— about Posey's conduct because he couldn't "trust nobody back here like that," an interviewer interrupted and said: "[s]ounds like you can't even trust the COs. . . . I mean, you told these two guys, and then in a matter of time Beth knows about it." *Id.* at 22:50-23:10. Pierce responded: "I know and that's what really got me tore up in here man. . . . She told me straight out her mouth, she says 'I know because someone from another shift from Truitt's shift' is what she said." *Id.*[1]

>    **B.    Jury Could Find That Threats and Retaliation Made the Grievance Process "Unavailable" Here**

This conversation sheds light on why Pierce's one-line-message to Officer Byrd three days later—requesting that Byrd speak "asap" about "my situation and all that has went on"—was so cryptic. Pierce had just been beaten, threatened, and labeled a "snitch" for making a confidential complaint about a corrections officer that had leaked back to the officer. The day after the attack, Sheriff's Department employees told him he could not trust corrections officers to keep internal complaints confidential. A jury could take those facts to conclude that prison officials "inhibit[ed] [Pierce] from utilizing an administrative process through threats or intimidation," such that the "process can no longer be said to be available." *Ross*, 136 S. Ct. at 1860 n.3 (quoting *Tuckel v. Grover*, 660 F.3d 1249, 1252-53 (10th Cir. 2011)).

---

[1] "Truitt" appears to be Sergeant Robert Truitt.

In *Kaba v. Stepp*, 458 F.3d 678 (7th Cir. 2006), the Seventh Circuit reached a similar conclusion in a case with analogous facts. There, the plaintiff was beaten by inmates in his cell, like Pierce here, but never filed any grievances before filing a § 1983 suit against the guard he said orchestrated the attack. *Id.* at 680-83. Prior to the attack, the guard threatened the plaintiff, who alleged that the attack amounted to retaliation for filing previous grievances. *Id.* The plaintiff argued that this excused him from exhausting because "it was unrealistic to expect him to file a grievance against the very people threatening retaliation" for filing internal complaints. *Id.* at 685. The Seventh Circuit agreed, reasoning that the attack itself would inhibit a reasonable prisoner from continuing to file grievances, even though the inmate had previously used the grievance system:

> The attack itself may have transformed the remedies from available to unavailable, for an ordinary prisoner in Kaba's shoes. . . . "[T]hreats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance," but not an external [lawsuit] because the latter might avoid "threatened retaliatory conduct from prison employees."

*Id.* at 686 (citation omitted). In *Tuckel v. Grover*, which the Supreme Court cited with approval in *Ross*, 136 S. Ct. at 1860 n.3, the Tenth Circuit made a similar point: "[a]n inmate who has been threatened or beaten for using administrative procedures has no reason to expect that an emergency grievance procedure, by virtue of being expedited, is somehow different and will not result in retaliation. If anything, [it] could be construed as hastening the retaliation an inmate might suffer." *Tuckel*, 660 F.3d at 1255.

And in *Himmelreich v. Federal Bureau of Prisons*, 766 F.3d 576, 577-78 (6th Cir. 2014), we reached the same conclusion with far less severe intimidation than is present here. There, the inmate failed to exhaust all grievance steps but said he was "intimidated by" a Captain Fitzgerald into not filing grievances. *Id.* at 577. Fitzgerald had allegedly threatened that if the inmate did not

stop filing grievances, she would "personally" have the inmate "transferred to a penitentiary" where he would "more than likely be attacked." *Id.* Fitzgerald allegedly "followed through with her threats" and placed the inmate in a special housing unit because of the inmate's complaints. *Id.* at 577-78. The question, we noted, was "whether [these] threats and actions would 'deter a person of ordinary firmness from [continuing with the grievance process].'" *Id.* at 577 (second alteration in original) (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999)). The answer was yes. Viewing facts in the inmate's favor, we held that a jury could find that these threats and actions would "render the grievance process functionally unavailable[.]" *Id*. at 578.

Pierce's facts are at least as strong. In *Himmelreich*, the officer merely threatened transfer to another unit where an attack may be more likely, and then transferred the inmate. Posey threatened to have Pierce "f---ked up" and followed through on that threat by having three inmates violently assault him the next day. If the actions in *Himmelreich* made the grievance process unavailable, the actions here did as well. As in *Kaba*, the "attack itself may have transformed the remedies from available to unavailable, for an ordinary prisoner in [Pierce's] shoes." 458 F.3d at 686. Even more so given that the day after the attack Sheriff's Department employees confirmed to Pierce that he could not trust the COs to keep his internal complaints confidential.

Given that Pierce was beaten in retaliation for filing internal complaints—and told by Sheriff's Department officials the very next day that he could not trust the COs handling his internal complaints—a jury could find that the grievance process was functionally unavailable to him.

### C.    The Intimidation Exception is Not Limited to Claims Against Posey

My colleagues appear to agree that Posey's threats and intimidation rendered the grievance process unavailable as to Pierce's claims against her, but they conclude that the exhaustion requirement still applied to the other defendants.  I respectfully disagree.

In *Himmelreich*, 766 F.3d at 576-78, we held that one official's retaliation could render the grievance process "unavailable" as to *several* defendants, not just the one doing the intimidating. There, the plaintiff sued several members of his prison's "B–Unit Disciplinary Team"—Captain Fitzgerald and four other corrections officers—under the Eighth Amendment for failing to protect him from an assault in his cell.  *Id.* at 576-77; *Himmelreich v. Fed. Bureau of Prisons*, No. 4:10-cv-02404, 2013 WL 3787619, at *1 (N.D. Ohio July 18, 2013) (naming other defendants).  Only Fitzgerald threatened the plaintiff—there was no indication that any of the other defendants did, or that the plaintiff feared reprisal from them.  Still, we reversed the district court's exhaustion-based dismissal as to the plaintiff's claims against all defendants, not just Fitzgerald.

Likewise, in *Does 8-10 v. Snyder*, we found that the threats of various unnamed prison officials rendered the grievance process unavailable to a plaintiff who brought several § 1983 claims against "former-Governor Rick Snyder and a host of other state officials and prison wardens."  945 F.3d 951, 955, 967 (6th Cir. 2019).[2]  There was no claim that Governor Snyder was the one doing the intimidating, and there was no indication that the plaintiff feared reprisals from him (or any other named defendant), yet that did not preclude the intimidation exception from applying to all the defendants in the case.

---

[2] The threats and retaliation included an allegation that the plaintiff's internal complaints about sexual assault were revealed—by an unnamed official—to other inmates, who would "think [he] was a 'rat' for reporting."  *Id.* at 967.  The plaintiff also said he was placed in solitary confinement and transferred to another facility, had his belongings destroyed, and that officials read his legal mail.  *Id.*

*Himmelreich* and *Snyder* show that we do not take a defendant-by-defendant approach to the intimidation exception.[3] Pierce brings claims against each defendant that relate directly to their part in Posey's attack. As in *Himmelreich*, he alleges that officers failed to prevent the attack—he asserts Marbet and Wilson were both on shift at the time, were both in the guard tower when prison policy required one to be out in the pod, and that they, like the other defendants, "encouraged . . . or failed to intervene to prevent" Pierce's "constitutional rights from being violated by fellow officers," an allegation that surely encompasses the attack Posey caused. R. 1 PID 6, 9-10. And as in *Snyder*, he sues higher-ups—Sheriff Rowland and Maury County—for "tolerat[ing] . . . [a] pattern[ or] practice . . . [of] violating [inmates'] constitutional rights" and "fail[ing] to prevent the same," an allegation that, again, encompasses the attack. R. 1 PID 10-11; *see also id.* at PID 5 (alleging that after Pierce's conversation with Posey, other inmates "began calling Mr. Pierce a snitch," but "the Maury County Sherriff's Department did nothing to protect him"). In *Himmelreich* and *Snyder*, it did not matter that most of the defendants were not doing the intimidating. The same should be the case here.

In concluding otherwise, my colleagues seem to rely on the following implicit premise: although Pierce could reasonably fear for his safety if he named Posey in a grievance about the attack, he still could have (and thus should have) filed a grievance that did not name her. But when we view the evidence in a light favorable to Pierce, a jury could find that Posey's threats rendered the grievance process unavailable for any grievance he filed regarding the attack, even if it did not

---

[3] Neither decision parsed the plaintiff's allegations to conclude that certain legal theories against certain defendants were excused from exhaustion while other legal theories against other defendants—stemming from the same general incidents—still had to be exhausted. That is likely because doing so could run afoul of the well-established principles that absent a specific state prison system's requirements to the contrary, inmates need not name specific defendants in grievances, *Jones v. Bock*, 549 U.S. at 217-19, or differentiate between precise legal theories when filing grievances, *see Burton v. Jones*, 321 F.3d 569, 575 (6th Cir. 2003) ("[W]e would not require a prisoner's grievance to allege a specific legal theory . . . ."), *abrogated on other grounds by Bock*, 549 U.S. at 217-19.

name Posey. There was already a track record of complaints getting back to Posey, so it is surely reasonable to conclude that if Pierce filed a grievance related to the attack, Posey would hear about it. Posey orchestrated the attack and already demonstrated a willingness to retaliate against Pierce to protect herself—directly, by having other inmates beat him or, more subtly, by spreading word that Pierce was a "snitch." *Cf. Snyder*, 945 F.3d at 967 (holding that unnamed officials rendered grievances unavailable for claims against all defendants by, among other things, leaking internal complaints to inmates, "exposing [plaintiff] to further threats and harassment from inmates who would think that [he] was a 'rat' for reporting").[4]

---

[4] The majority infers from a note Pierce sent two weeks after the attack that he felt safe to name other guards. Majority Op. at 6. The note was filed on November 1, 2017. November 1 is the date Pierce was transferred to another jail. *See* R. 33 PID 191 ("On November 1, 2017, Mr. Pierce was transferred to Lawrence County Jail for housing where he has remained until the present."). Perhaps Pierce did feel safe at that point. But the November 1st date is irrelevant to the exhaustion issue. Pierce was required to file a grievance in the seven days following the attack—a period that ended well before November 1. What is relevant to our inquiry is Pierce's state of mind—and what an objective prisoner in his position would reasonably believe—in that seven-day window. Pierce's fear on November 1 is irrelevant to the inquiry because the time for filing grievances had expired by that point. The fact that Pierce felt safe enough to raise a complaint about the attack at that point—when there was no longer a reason to fear retaliation, given that he was headed to a new facility with new guards—in no way suggests that he felt "safe enough" to do so earlier, during the initial seven-day window he had to file a grievance about the attack. If anything, it suggests the opposite. Reading the record favorably to Pierce—as we must do here—the fact that he waited until transfer to raise a grievance regarding the attack, and did so *immediately* upon being transferred, only bolsters the inference that Pierce wanted to raise complaints about the attack but did not feel it was safe enough to do so while still incarcerated in the Maury County Jail. To the extent the majority relies on this point to distinguish *Himmelreich* and *Snyder*, *see* Majority Op. at 6 n.3 ("These facts . . . show why we are not in tension with [*Snyder* and *Himmelreich*].") the point is unpersuasive because it is based on an incomplete factual premise.

The majority's only other effort to distinguish *Himmelreich* and *Snyder* is based on its own belief that if Pierce filed a grievance without naming Posey, "there is no reason to believe it would get back to Posey." *Id.* at 6. Perhaps a juror at trial could reach that conclusion, but we are bound to read the record favorably to Pierce. And putting that point aside, in *Snyder*, there was no reason to believe a grievance would "get back to" Governor Snyder, but that did not stop the intimidation exception from applying to him. 945 F.3d at 967. As noted, we likely did not search the grievances in *Snyder* and *Himmelreich* for specific references to defendants who did not do the intimidating (which, in essence, is what the majority requires of Pierce here) because we are not permitted to fashion federal-judge-made requirements that a grievance name specific defendants—something the Supreme Court specifically reversed our circuit for doing in *Jones v. Bock*, 549 U.S. at 217 ("The Sixth Circuit threw out the Williams and Walton suits because those prisoners had not identified in their initial grievances each defendant they later sued. Here again the lower court's procedural rule lacks a textual basis in the PLRA. . . . [N]othing in the statute imposes a 'name all defendants' requirement along the lines of the Sixth Circuit's judicially created rule.").

Whether or not Pierce named Posey in a grievance, it would be reasonable to fear that she would take similar actions if she found out—as the Sheriff's Office essentially told Pierce she would—that Pierce was filing grievances about an attack that she facilitated. Just days earlier, she had told him that she would have him "f---ked up" if he did anything to get her in trouble. Grievances invite investigations, and investigators ask questions. Chief among them would be: "why were you attacked?" That question would come whether Posey's name was in a grievance or not. Its answer could implicate Posey. Posey would know that, as would Pierce. The risk is self-evident that Posey might do the same thing she had just done—retaliate further against Pierce to protect herself through intimidation and, possibly, violence.

The question is whether, in light of that risk, an inmate of ordinary firmness "would [be] deter[red]" from raising any complaints about the attack. *Himmelreich*, 766 F.3d at 578. A jury could say "yes." It goes too far to say that Pierce, despite having just been beaten for similar complaints, was required to test his luck—i.e., file a grievance that does not name Posey and hope she does not find out about it—when a miscalculation could jeopardize his physical safety. "An inmate who has been threatened or beaten for using administrative procedures has no reason to expect that" filing grievances relating to the threat or beating will not lead to the same result. *Tuckel*, 660 F.3d at 1255; *see also Rinaldi v. United States*, 904 F.3d 257, 267 (3d Cir. 2018) ("[I]t is 'difficult to accept the proposition that an administrative remedy is available in any meaningful sense if its use will result in serious retaliation and bodily harm.'" (quoting *Tuckel*, 660 F.3d at 1252)). A reasonable prisoner in Pierce's shoes would reasonably hesitate—out of fear for his own safety—before filing further complaints about an attack Posey orchestrated, whether or not

she was named.  A jury could reach that conclusion on this record, and we must read the record in the light most favorable to Pierce on this question.[5]

---

[5]  Pierce adequately raised this issue below and on appeal, but he did so under the wrong legal label.  But that mistake does not suffice to forfeit the issue.  On the whole, I do not take the majority to suggest otherwise.  But because the issue is close, I nonetheless address it here.

Prior to *Ross v. Blake*, 136 S. Ct. 1850 (2016), some circuits recognized a "special circumstances" exception to the PLRA's exhaustion requirement, but *Ross* clearly held that the only pertinent exceptions stem from § 1997e(a)'s use of the word "available." *Id.* at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.  The only [exception] is the one baked into [§ 1997(a)'s] text: An inmate need exhaust only such administrative remedies as are 'available.'"). *Ross* recognized that threats and intimidation fit within the "unavailability" category. *Id.* at 1860.  That was in line with the approach of several pre-*Ross* circuit decisions, including ours in *Himmelreich*, 766 F.3d at 577-78.  But some circuits, including the Second Circuit, had placed the threat/intimidation exception under the rubric of "special circumstances." *See, e.g., Hemphill v. New York*, 380 F.3d 680, 690-91 (2d Cir. 2004).  In general, the Second Circuit asked the same substantive question, but used the wrong label. *See id.* at 690 (noting that threats could provide a "special circumstance[]" justifying failure to exhaust if they would deter a similarly situated inmate of ordinary firmness from following normal procedures).

Below and on appeal, Pierce relied on *Hemphill's* outdated labels.  Below, he argued that under *Hemphill*, failure to exhaust "may be excused if (1) administrative remedies were in fact unavailable; (2) the defendants forfeited the defense . . .; or (3) special circumstances justify the failure to properly exhaust." R. 44 PID 362 (citing *Hemphill*, 380 F.3d at 686).  He also noted that the "same facts sometimes fit into more than one of these categories." *Id.*  He then made the argument—along with other meritless arguments—that the attack rendered grievances unavailable, but placed this argument under the category of "special circumstances." *See id.* at PID 362-63 ("[T]he special circumstances are that Mr. Pierce *was a cooperating witness against certain MCSD Deputies and they had him jumped* and locked away from all kiosks." (emphasis added)); *id.* at PID 362 (noting that Pierce filed a grievance about the attack "immediately upon departing the jail, when he was finally safe").  He did the same in the exhaustion section of his appellate brief. *See* Appellant Br. at 18 ("[T]he special circumstances are that Mr. Pierce was a cooperating witness against certain MCSD Deputies which poses inherent danger for retaliation by employees of MCSD.").  And in separate sections of his brief below and on appeal—albeit, the "qualified immunity" section of his brief below and the "statement of the case" section in his appellate brief—he explicitly added that he feared for his safety. *See* R. 44 PID 368 ("Mr. Pierce asked to speak to the Sheriff and several administrative staff and received no assistance.  Mr. Pierce feared for his safety.  MCSD did not follow their own procedures."); Appellant Br. 10 ("Pierce, who feared for his safety, reasonably believed that he had complied with the Maury County grievance process.  Defendants' written procedures specifically allow for an inmate to seek immediate relief from a shift supervisor or correctional officer if they believe there is substantial risk of imminent harm.  Plaintiff followed this procedure by asking to speak to the Sheriff and two supervisors."); *id.* at 11 ("Following the attack, Plaintiff then sent a hand-written request [to press charges and submitted three kiosk requests]. . .  Plaintiff feared retaliation from staff at the Maury County Jail, specifying his concerns could lead to additional problems.").

That preserved the issue even if Pierce used an outdated label to do so. *See Ogle v. Sevier Cnty. Reg'l Plan. Comm'n*, 838 F. App'x 913, 917 (6th Cir. 2020) ("[I]f a party makes the argument in a different manner that can fairly be interpreted as 'another way of saying' the point, it likely did not forfeit that claim." (quoting *Haywood v. Hough*, 811 F. App'x 952, 959 n.1 (6th Cir. 2020))); *see also McNeal v. Kott*, 590 F. App'x 566, 569 (6th Cir. 2014) ("In objecting to [a report and recommendation denying qualified immunity], it is also true, [defendants] did not use the words 'qualified immunity.'. . . [But they] objected to the magistrate judge's report by arguing that [plaintiff] had not 'alleged a deprivation of a constitutional right at all.'. . .  One does not forfeit a qualified immunity defense by making arguments that, if accepted, establish the defense."); *Tree of Life Christian Schs. v. City of Upper Arlington*, 905 F.3d 357, 383 (6th Cir. 2018) (Thapar, J., dissenting) ("Tree of Life discussed all the necessary elements for the facial argument, just without the labels. *Cf.* [*McNeal*, 590 F. App'x at 569]. . . . [The issue] should not be beyond judicial review just because Tree of Life did not use the 'magic words' in its own brief.").  Finally, I respectfully disagree with the assertion that "Pierce does not even argue that he failed to properly grieve his claims as to [non-Posey]

defendants because he feared that the complaints would reach Posey and potentially cause her to retaliate." Majority Op. at 6. Pierce argued that he "was a cooperating witness against certain MCSD Deputies which poses inherent danger for retaliation by employees of MCSD." Appellant Br. at 18.

Respectfully, in my view, this suffices. But I acknowledge that this is a close question, particularly in light of the poor organization of Pierce's summary-judgment brief below. That brief interspersed two separate types of allegations without attempting to disentangle them for the reader: (1) the inaccurate assertion that there were no kiosks available to him and (2) assertions that he had been attacked, was a cooperating witness, and filed a grievance as soon as he felt safe. *See, e.g.*, R. 44 PID 362 (beginning paragraph by asserting that no kiosks were available but ending it by asserting that he "also filed a grievance . . . immediately upon departing the jail, when he was finally safe"); *cf. id.* at PID 368 (stating that "Mr. Pierce feared for his safety[,]" "asked to speak to the Sheriff and several . . . administrative staff[,]" and received no assistance," but doing so in qualified-immunity section of brief, without tying these assertions directly to the exhaustion issue). In one example of this muddled organization, Pierce combines "fear for safety" and "locked-away-from-kiosk" allegations in a single sentence: "the special circumstances are that Mr. Pierce was a cooperating witness against certain MCSD Deputies and they had him jumped and then locked away from all kiosks." *Id.* at PID 362-63. The first clause of this sentence raises a viable argument implicating the intimidation exception: that Pierce was excused from exhausting because he was a cooperating witness against—and had just suffered an attack instigated by—the very officials controlling the grievance procedures. But the next clause asserts a clearly meritless one: that he was "locked away" from kiosks (a claim that Pierce's grievance record shows is false). Pierce's appellate brief—though retaining the same structure—improves this organizational problem slightly; he revises this "special circumstances" sentence to more clearly focus solely on his retaliation theory, deleting the confusing add-on clause stating that he was "locked away" from kiosks and replacing it with more retaliation-specific language. *See* Appellant Br. at 18 ("[T]he special circumstances are that Mr. Pierce was a cooperating witness against certain MCSD Deputies which poses an inherent danger for retaliation by employees of MCSD."). While he fixes this problem on appeal (and, as noted, raises more intimidation-specific assertions earlier in his appellate brief, *see* Appellant Br. at 10-11), the unfortunate organization of the "special circumstance" sentence in his brief below raised a risk that a reader may focus in on one theory to the exclusion of the other.

But nonetheless, both were raised. That Pierce raised an inviable argument alongside a viable one—while not an example of perfect draftsmanship—should not cause us to deem the viable issue to be forfeited. To the extent the majority bases its conclusion on Pierce's failure to argue the intimidation exception as to the non-Posey defendants, Majority Op. at 6, I respectfully disagree, though I acknowledge that this is a close question.